FILED

JUN 2 8 2024

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

SARAH ELIZABETH ALKUDA and
J.A., a minor, by and through his mother and
natural guardian

Mailing Address:
945 McKinney St. Unit 17873
Houston, TX, 77002

Residential Address:
Al Khan, Sharjah, U.A.E.

Plaintiffs,

-vs-

MCDONALD HOPKINS Co., L.P.A.
600 Superior Avenue Northeast
Suite 2100
Cleveland, Ohio 44114

Case No. 1:24 CV 01103

COMPLAINT

JUDGE BRENNAN

MAG. JUDGE SHEPERD

COMPLAINT FOR A CIVIL CASE

## I.  THE PARTIES TO THIS COMPLAINT

    a.  Plaintiffs: Sarah Elizabeth Alkuda and J.A. (My minor son)

       Mailing Address: 945 McKinney St., Unit 17873, Houston, TX 77002.

       Residential Address: Al Khan, Sharjah, United Arab Emirates (U.A.E).

       Phone Number: +1 (949) 677-8012 or +971 56 817 7335

       Email Address: Sarah.Alkuda@gmail.com

    b.  Defendant: McDonald Hopkins Co., L.P.A.

       Address: 600 Superior Avenue Northeast, Suite 2100, Cleveland, Ohio 44114.

## II.    BASIS FOR JURISDICTION

The basis for jurisdiction in this case is the diversity of citizenship. I, Sarah Elizabeth Alkuda and my son, J.A. are citizens of the United States, most recently residents of California, and currently residing in Sharjah, the United Arab Emirates. McDonald Hopkins Co., L.P.A. is located in Cleveland, Ohio. The amount in controversy exceeds $75,000. The claims against McDonald Hopkins Co., L.P.A. involve substantial financial implications, including damages arising from the breach of fiduciary duty by McDonald Hopkins to properly account for the trusts in M. Tarif Zaim's estate, which was valued at more than $9 million at the time of his death in 2016, this amount does not include the as of yet unaccounted for Irrevocable Trusts intended for me and my sisters estimated to have been valued $12 million in total at the time of my father, Dr. Zaim's death. Significant legal fees and costs that I incurred in seeking proper accountings and distributions from the trusts exceeded $85,000.

I am bringing this suit under the Ohio Savings Statute, Ohio Revised Code § 2305.19(A). The previous litigation was Cuyahoga County Probate Court Case No. 2019 ADV 242693 which spanned from April 2019 to June 2023. I moved overseas in October 2022 for reasons relating to war in my husband's home country and the need to get my mother-in-law, sister-in-law, and husband's niece out of harm's way. It's important to note that that the Probate court was not accommodating of my overseas residency. Despite requests to postpone a pretrial due to international travel challenges, the court required in-person attendance. I requested a postponement of the trial set for June 21, 2023, due to delays in her my residency visa application, which prevented me from leaving the country without jeopardizing my employment. The court denied this request, citing the long pendency of the case and the necessity of in-person attendance. This decision forced me to choose between compromising my legal rights and risking the loss of her job and residency status in the UAE. Consequently, due to this judgement and the financial strain that I faced as the result of the litigation, I was forced to drop the charges against McDonald Hopkins with plans to refile within the one-year deadline under the Ohio savings statute. The claims against McDonald Hopkins were dismissed on June 28, 2023.

## III.    BACKGROUND

**Introduction**

Thank you in advance for your assistance with my case. This case involves the mishandling of family trusts by the law firm McDonald Hopkins. As a result of their actions, a multi-million-dollar trust remains unaccounted for, my son and I have been disinherited, and our family has been divided.

I am bringing this suit under the Ohio Savings Statute, Ohio Revised Code § 2305.19(A), which allows for the refiling of a lawsuit within one year if the original action failed otherwise than upon the merits. The previous litigation, Cuyahoga County Probate Court Case No. 2019 ADV 242693, spanned from 2019 to 2023. I have attached the complaint as exhibit A. This statute ensures that the claims raised in the prior case can be revisited and addressed appropriately in the present suit. As stated in the Ohio Savings Statute, "In any action that is commenced or attempted to be commenced, if in due time a judgment for the plaintiff is reversed or if the plaintiff fails otherwise than upon the merits, the plaintiff...may commence a new action within one year after the date of the reversal of the judgment or the plaintiff's failure otherwise than upon the merits."

The facts will demonstrate that my mother, as trustee, implicitly trusted Kate Wensink, her primary contact at McDonald Hopkins, the various lawyers who represented her throughout the litigation from McDonald Hopkins, Attorney John Schiller from Walter Haverfield, and her financial adviser, Fareed Siddiq. Throughout the previous litigation, when discovery requests were made of my mother as trustee, she relied on her counsel, working together with McDonald Hopkins, to respond. It became clear to me that McDonald Hopkins was effectively running the show, using their influence over my mother as her legal counsel to control the narrative. My mother made multiple statements in her deposition expressing her belief that these professionals had her best interests at heart, but as the facts will show, they did not.

McDonald Hopkins is the sole defendant in this case because, in concert with my mother's counsel, they orchestrated the wrongful actions and misrepresentations that were

counter to my mother's and our family's interests. This is a case about how a law firm with too much power took advantage of an inexperienced widow after the loss of her loved one, to misappropriate a family's money or to cover up its misappropriation. While these claims may sound extreme or unbelievable, this has been my lived experience and I will do my best to explain them as simply as possible. I respectfully ask for your help to provide a fair review of my case and to help me uncover and remedy the wrongdoing of these trusted professionals. My goal is to prevent this type of abuse from happening to other families in Ohio and across the country. Primarily for financial reasons, I will be representing myself Pro Se. I have attached a motion requesting permission to do so.

**Background**

My father was meticulous with his money. He spent little and put most of what he earned away to secure his family's future. By the end of his career, he was making over $1 million a year, as evidenced by his 2011 income tax statement (Exhibit B), and had been a partner at his medical practice, University Dermatologists, for over a decade.

As my father's oldest daughter, I had been involved with his financial affairs long before his illness or death. He confided in me about financial matters, including his income, a financial settlement he reached with his business partners, his investments, taxes, and his estate planning. Shortly before he passed away, in a period of panic, my father expressed concerns to me about the handling of his affairs. He worried that my mother was not experienced enough to manage his affairs alone. He asked me to assist her with his estate administration and ensure that his assets were appropriately accounted for and allocated to his trusts according to his testamentary wishes. He gave me a copy of his estate plan and logged me into some of his brokerage accounts.

After his death, I assisted my mother with the estate administration, sorting through my father's files to identify and record all his assets. In the process, I worked with the law firm and financial adviser to assist with the estate administration. However, as I began to identify red flags and raise concerns, I was unceremoniously excluded from the administration process by Kate Wensink at McDonald Hopkins.

McDonald Hopkins has been involved in my father's estate planning from the very beginning. My father's estate plan was set up in 1997 with the assistance of Bernard Karr at McDonald Hopkins. The trust documents were held in McDonald Hopkins' vault. Over the years, my father made several changes and amendments to the estate plan, always involving McDonald Hopkins. He made trust modifications in 2005, 2013, and 2014. In 2013, Kate Wensink became the principal point of contact at McDonald Hopkins. She continued to be the point of contact for my mother as Trustee and for the beneficiaries after my father's death in January 2016. After his passing, Kate Wensink oversaw the administration of my father's estate. This extensive involvement of McDonald Hopkins in both the creation and administration of the estate plan highlights their fiduciary responsibilities and lays the foundation for understanding the subsequent failures and issues that arose.

**The Estate Plan**

The following outlines the key components of my father's estate plan most important to this litigation. Although these trusts are the primary focus, discovery requests may extend beyond them to ensure a comprehensive understanding of the financial landscape and to follow the money trail accurately.

1. **The Irrevocable Trust** (Exhibit C)
   a. The Irrevocable Trust, officially named "The Irrevocable Trust Between Mohammad Tarif Zaim and Lori Ann Muller-Zaim," was established on May 27, 1997.
   b. The trust was designed to be divided into separate trusts for each of his daughters: Me, Nadia, and Hannah. Upon reaching the age of 30, each daughter would receive their share of the trust assets.
   c. We will later delve into the details of this trust, including proof that it was funded, the shifting and falsifiable narratives provided by McDonald Hopkins about its termination, made without my mother's involvement or knowledge, their

concerted and unfortunately successful attempts to avoid granting me access to its records, and their complete failure to prove that it was terminated.

2. **MTZ Trust** (A and B Trusts) (Exhibit D) and Modification (Exhibit E)
   a. Officially named "The Declaration of Trust of Mohammad Tarif Zaim," this trust was established on May 27, 1997, and modified on September 6, 2013.
   b. The trust divides into Trust A and Trust B to allocate Dr. Zaim's assets upon his death, with Trust A often referred to as a "Credit Shelter Trust" to utilize the estate tax exemption and Trust B serving other specific beneficiary needs as outlined in the estate plan. I am a current beneficiary of the B trust and a contingent beneficiary of the A trust.
   c. These trusts were a large part of the first litigation, but I do not wish to focus on them now. While there are concerns about McDonald Hopkins' involvement in their administration, they served as distractions, leading us down rabbit holes and diverting attention away from the Irrevocable Trust. Although I was disinherited from these trusts and supposedly reinstated, I have no evidence of this reinstatement. My interest in these trusts and my mother's other assets (personal assets, personal trusts, business, etc.) is primarily due to concerns that they may have been used to move assets. A professional accountant's review of the trust records for the A and B trusts revealed concerning findings, which will be discussed later and supported with exhibits.

3. **Irrevocable Life Insurance Trust** (ILIT)
   a. This trust was also established on May 27, 1997 and confirmed to have terminated in 2009. We requested records for this irrevocable trust, of which I was also a beneficiary. McDonald Hopkins managed to obtain and produce records proving that this trust terminated in 2009. This is relevant because they were unable to produce similar records for the main Irrevocable Trust, which they claim terminated in 2010.

4. **Roth IRA**

a. Another significant component of my father's estate is the Roth IRA account with Vanguard, valued at $1.2 million at the time of his death. In a 2013 conversation, my father informed me that upon his death, the account would be divided into three parts, one for me and each of my sisters. To facilitate this transfer, we each have a Vanguard Roth IRA account that he set up. However, in an initial meeting with Kate Wensink in February 2016, she informed us that due to a "mistake" by my father, the account would instead have to pay out to my mother. This information was perplexing, and I sent multiple emails asking for an explanation. Despite these efforts, months later, the account began to pay out to my mother. Even our financial adviser was very confused by this situation. This represents an additional $400,000 that I expected to receive and for which I need answers.

**Previous Case: Cuyahoga County Probate Court Case No. 2019 ADV 242693.**

Since my father's death, I have been requesting trust records from McDonald Hopkins to verify that all his assets were accounted for and allocated to his trusts as per his wishes. I wanted to ensure that my family's interests were being protected, particularly in light of concerns that arose as I assisted with the estate administration, such as the handling of the Roth IRA. Additionally, I did not receive a sizable inheritance as expected in June of 2016, which will be explained further below. The original complaint details my concerns and all the requests that I made prior to litigation, including multiple emails and official letters sent over the years, which were largely ignored, inadequately addressed, or met with evasive responses (Exhibit A). Left with no other option, in 2019 I filed a Complaint for an Accounting with the Cuyahoga County Probate Court [1] against McDonald Hopkins, also naming my mother who was Trustee of all relevant trusts. What should have been a simple matter turned into a four-year protracted legal battle characterized by stonewalling and avoidance in providing the records necessary to alleviate my concerns about the administration of the trusts.

---

[1] I am a current beneficiary of the Irrevocable Trust, and of Trust B, and a contingent beneficiary of Trust A (the other part of the MTZ Trust). Under Ohio Revised Code (ORC) 5808.13, beneficiaries are granted access to the "material facts necessary for them to protect their interests." Additionally, both the MTZ and Irrevocable Trusts explicitly state that "any beneficiary...shall at all reasonable times have the right to inspect the records of the trust" (MTZ Trust Item X, Section 10.3, and Irrevocable Trust Item IV, Section 4.4)

The four years of litigation can be boiled down to three topics: McDonald Hopkins fiduciary duty to trust beneficiaries, the mystery of the Irrevocable Trust, and the concerning findings in the Trust A and B records. I go into each of these three topics as well as the outcome of that case as clearly and concisely as possible below.

## Part 1: McDonald Hopkins Duty to me as Trust Beneficiary

### A Duty was Established

My mother delegated significant trustee duties to McDonald Hopkins, as evidenced by their engagement agreement from 2016. (Exhibit J) This agreement explicitly states that McDonald Hopkins would handle "preparing a complete inventory of all assets, which are subject to probate," and "prepare and complete all reports to the Probate Court and the beneficiaries of the estate as required during the course of administration of the estate." Additionally, an official letter from Kate Wensink to trust beneficiaries dated February 26, 2018, confirms that she was retained by my mother in her capacity as trustee and would be sending annual accountings on her behalf. The letter concludes with, "If you have any questions, please direct them to me or my colleague Bernard L. Karr," reinfocing that communication with beneficiaries was also delegated to McDonald Hopkins. (Exhibit K)

Furthermore, there is ample evidence that McDonald Hopkins performed these delegated tasks, such as emails and accountings provided by Kate Wensink on behalf of my mother as Trustee. In her deposition, my mother confirmed that the annual accounting to beneficiaries was done by "the lawyers, yes. Lawyer. It would be Kate Wensink." When asked if she communicated with beneficiaries, she stated that she asked McDonald Hopkins to send the necessary information, confirming, "Meaning they pushed send, yes, and I asked them to do that."

The court rulings also support this delegation, and the duty owed by McDonald Hopkins to beneficiaries. In an August 6, 2019 judgment entry, Judge Anthony J. Russo found that "although a trustee is under a duty to personally perform the tasks involved in administering a

trust, delegating these responsibilities to others is a common practice" and recognized that "R.C. 5808.07 permits a trustee to delegate powers and duties to others" (Exhibit L). Furthermore, Judge Russo explicitly stated that "in performing delegated functions, an agent or fiduciary owes a duty to the trust to exercise reasonable care to comply with the terms of the delegation". This means that McDonald Hopkins, in undertaking these delegated duties, had the same obligations to the trust beneficiaries as the trustee would. A November 5, 2020 judgment entry reinforced this by affirming that "the allegations in the Complaint, when viewed most favorably to the plaintiff, would entitle the plaintiff to relief if the Court were to find a delegation of duties to McDonald Hopkins and if the Court were to find that McDonald Hopkins breached their duty to the trust in failing to exercise reasonable care to comply with the terms of the delegation" (Exhibit M).

In my mother's testimony, she spoke freely about the tasks she had delegated to Kate Wensink. For example, she stated that the annual accounting to beneficiaries was done by "the lawyers, yes. Lawyer. It would be Kate Wensink." Furthermore, when asked if she communicated with beneficiaries, she explained that she asked McDonald Hopkins to send the necessary information, confirming, "Meaning they pushed send, yes, and I asked them to do that."

### McDonald Hopkins controls the narrative, deceives my mother

Surprisingly, my mother's own attorney, John Schiller, argued the opposite—that no services were delegated to McDonald Hopkins. In his 12/17/2021 Brief in Opposition to Plaintiff's Motion to Enforce Discovery, Attorney Schiller argued that Ms. Muller Zaim did not delegate any tasks to McDonald Hopkins. He even filed a motion in support of McDonald Hopkins' motion to dismiss on 11/3/2020, based on the absence of delegation to McDonald Hopkins. This position is troubling because my mother's testimony clearly shows that she was unaware that her attorney had taken this position. When presented with a statement prepared by Attorney Schiller, which she had signed and which claimed that she did not delegate duties, she could not understand or explain it, saying, "That doesn't make sense." This contradiction highlights the dissonance between her understanding and her attorney's actions.

Here, it is evident that my mother expected her attorney and McDonald Hopkins to have her best interests at heart. Instead, it turns out that Attorney Schiller's actions raise serious questions about his allegiances. By arguing that no duties were delegated to McDonald Hopkins, Schiller incriminates his own client. If McDonald Hopkins was not responsible for the failure to produce accountings, then my mother was. She did not know, and may still not know, that her lawyer took the position that no duties were delegated to McDonald Hopkins. By asserting this, Attorney Schiller essentially blamed her for the failures of McDonald Hopkins, allowing McDonald Hopkins to control the narrative of a central issue in this case.

### Part 2: The Mystery of the Irrevocable Trust

In June 2016, on my 30th birthday, I was supposed to receive an estimated $4 million from the Irrevocable Trust established by my father in 1997 with the law firm McDonald Hopkins. Despite extensive efforts, I still have no understanding or evidence as to why I did not receive the money, or where it went.

Note: As I discuss the defendants' responses to discovery throughout the rest of this document, it is crucial to understand that although documents were requested from the Trustee *and* McDonald Hopkins, the responses to discovery were handled primarily by McDonald Hopkins and my mother's attorney John Schiller. My mother, trusting these professionals to manage her case, had little involvement or understanding of the litigation. Her deposition responses made it clear that she was taken advantage of, particularly regarding the delegation issue discussed above and the Irrevocable Trust matter that we will go into next. These contradictions highlight the disparity between my mother's belief and understanding, and the actions of the legal professionals that she trusted to represent her interests.

### *The Trust was Funded*

I have multiple reasons to believe the trust was funded. First, my father explicitly confirmed the funding of the trust in conversations with me, as detailed in my 2020 affidavit

(Exhibit F). Furthermore, he also informed his brother and his sister that $2.5 million had been set aside for each of his three daughters. The law firm McDonald Hopkins has not denied that the trust was funded. In her deposition from January 2022, my mother stated that the trust held $6 million at the time of my father's death in January 2016. (Exhibit G)

Additionally, in September 2013, the trust was included in a packet of my father's "current estate planning documents" sent by a senior paralegal at McDonald Hopkins, whereas the terminated Irrevocable Life Insurance Trust (The ILIT that was proven to be terminated in 2009) was not included. My father provided me with a copy of the Irrevocable Trust along with other estate planning documents in November 2015 before his passing.

Moreover, I possess a statement from January 2004 showing $15K in a Sarah Irrevocable Trust account. (Exhibit H) In the next section I will explain why McDonald Hopkins made it impossible for me to discover more records from third parties. Nonetheless, these pieces of evidence collectively support the assertion that the trust was indeed funded and operational at the relevant times.

### *McDonald Hopkins' Avoidance and Deception Tactics in Responding to Discovery Requests*

In this section I will provide a complete review of everything that was said or produced by defendants relating to the Irrevocable Trust, organized by the strategies of avoidance and deception that characterized their responses to discovery requests for Irrevocable Trust records and information.

*Strategy 1: Sabotaging 3rd Party Record Discovery*

Despite multiple requests, McDonald Hopkins failed to produce a single financial document relating to the Irrevocable Trust. This strategy prevented me from obtaining any Tax Identification Numbers (TIN) or account numbers related to the Trust, which were essential for third-party discovery.

Throughout the litigation, the defendants employed various obstructionist tactics to block my efforts to obtain records from third parties. These tactics included motions to quash, requests to stay discovery, and letters to third parties instructing them not to respond to our records requests. As a result, when we were finally allowed the opportunity for third-party discovery, we still lacked the necessary identifying information, such as TINs or account numbers, to obtain meaningful records.

Morgan Stanley produced a single 2004 statement showing $15,000 in a Sarah Trust account and informed me that there were *more records* but that they required a court order with TIN and account numbers in order to produce them. This order was requested from the court on January 4, 2023, but was not granted perhaps because, by that time, we had passed multiple discovery deadlines set by the court at the defendants' request. The defendants' persistent resistance and strategic obstruction effectively prevented us from accessing third party records, epitomizing a stonewalling strategy.

*Strategy 2: Efforts to Create Confusion about Termination*

McDonald Hopkins provided inconsistent and unsubstantiated statements regarding the use and termination of the trust. In response to a 2018 request for accounting information prior to the litigation, Kate Wensink at McDonald Hopkins stated that the Irrevocable Trust had been spent years ago on the Plaintiff's education. However, a few days later, she revised this statement, saying instead that "the Irrevocable Trust was terminated many years ago and that *such trusts* were often used to fund the education of beneficiaries." There was no evidence provided that supported the assertion that the trust funds were used for educational purposes and the theory will be disproven below.

In an attempt to create confusion, different dates and timeframes were given for the trust's termination:

- In their 7/11/2019 Answer to the Complaint, McDonald Hopkins stated the "trust terminated years ago, thus obviating any duties thereunder."
- A follow-up letter sent to McDonald Hopkins on 9/20/2019 for proof of the trust's closure received no reply.
- In response to the 10/5/2020 Request for Production of documents relating to the trust, McDonald Hopkins wrote that the "Defendant states that she does not have any responsive documents pertaining to the Sarah Trust… as Defendant believes that the Sarah Trust was terminated on or before July 2005." (Response to Interrogatory 3, 4)
- In response to our 11/5/2019 interrogatories, McDonald Hopkins, as counsel for Lori, stated that the date the trust wrapped up is "unknown" but also mentioned July 2005 as a possible date. They claimed to have an attorney note from Bernard Karr dated July 13, 2005, that "evidences" the termination of the trust but did not produce the note.
- In response to the 10/5/2020 second set of interrogatories, they stated: "Defendant believes that the Irrevocable Trust was terminated at least several years prior to Dr. Zaim's death, and possibly before 2010." (Response to Interrogatory 23) and "Defendant believes that the Sarah Trust was terminated on or before July 2005." (Response to Interrogatory 3, 4).
- In a production of records sent on October 22, 2019, in response to a court order, McDonald Hopkins provided a copy of the Irrevocable Trust instrument, upon which it can be seen that someone named "C. Morales" at McDonald Hopkins applied a text box to the document on October 21, 2019. The text box says "Terminated on or before 2010."

*Strategy 2: Efforts to Create Confusion about Trust Identity*

Another tactic to create confusion involved introducing different names for the Irrevocable Trust, such as the Sarah Trust, the 2503(c) Trust, and the Grantor Trust:

- In their 7/11/2019 and 8/19/2019 nearly identical Answers to the Complaint, McDonald Hopkins claimed not to have knowledge of an Irrevocable Trust, but mentioned that they thought the Plaintiff was referring to a "2503(c) Trust" that "terminated years ago, thus obviating any duties thereunder." This claim of ignorance is perplexing considering that

the complete trust instrument was attached to the complaint, referred to by its full name, the same name that their firm had given the trust when assisting with its drafting.

- In their 2/7/2020 response to a request for production, they stated that "the 2503(c) Trust was a grantor trust; thus to the extent that it had any income, it would have been reported on Tarif and Lori's returns."
- In a 3/2/2021 response to a second request for production, they further complicated the identity of the trust by saying that "The Sarah Trust, a 2503(c) Trust which was formed out of the Irrevocable Trust" (LMZ response to Interrogatory 4).

McDonald Hopkins failure to provide essential documents, efforts to hamper third party discovery, inconsistent statements about the trust's use and termination, and their introduction of multiple trust names all served to obstruct the discovery process. This behavior undermined the integrity of the legal proceedings. In the following section, I will disprove the few assertions they made about the trust and show how they are behind the effort to conceal information without the trustee's knowledge or involvement.

### The Irrevocable trust was not used to pay for education

The defendants have not disputed that the trust in question was funded, but their claim that it was terminated does not hold up under scrutiny. According to deposition testimony, my sisters Nadia and Hannah graduated from school in 2013 and 2016 respectively. If the trust was used to pay for their education, it could not have terminated in 2005 or 2010, as the defendants claim. Ms. Muller Zaim and Hannah both testified in their January 2022 depositions that the three daughters' educations were paid for by "Scholars Choice" accounts. The Trustee even stated that she wrote the last Scholars Choice check in 2016. Additionally, a Scholars Choice withdrawal form produced by the defendants indicates that Sarah's Scholars Choice account was held in Dr. Zaim's SSN, not in an Irrevocable Trust's TIN. For these reasons, the defendant's claim that the trust was used to pay for education is not credible.

### They could have produced records to evidence the Trust's termination but they did not

As council for the trustee and for themselves, McDonald Hopkins sought out evidence from no less than seven financial institutions to provide documentation for all the other trusts in question. These institutions include Morgan Stanley, Merrill Lynch, Vanguard, Allianz, Prudential, Lincoln, and Genworth. They could have done the same for the irrevocable trust, but they chose not to. Retrieving the TIN and tax returns can be done in a single call to the IRS, and there is no question as to the institution or person they needed to go to, as we know it would have been Fareed at Morgan Stanley (then "Citibank"). There is no issue with a limited retention period, as they were able to produce documents proving the 2009 termination of the Irrevocable Life Insurance Trust, and because the Irrevocable Trust statement we discovered is 18 years old. They could also have reached out to scholars choice, Emory, Denison, or Ohio State to prove their education payment story but they haven't.

### *Once Again, McDonald Hopkins Controls the Narrative*

In Ms. Muller Zaim's January 10, 2022, deposition, we learned that she was completely unaware of the circumstances surrounding the Irrevocable Trust. She said that the trust held six million at the time of Tarif's death but did not know if or when it terminated. Attorney Vasvari asked, "When did this trust terminate?" She answered: "You asked me that and I said I don't know." He then asked Do you know if it terminated?" and she responded: "I'm not sure." She also did not know what it was used for. The statements made on my mother's behalf regarding the timing and the way the trust was wrapped up did not come from her knowledge or records. This story originated from McDonald Hopkins. If the trust money was indeed spent on my education, demonstrating it would be straightforward. So, what is the reason for the secrecy?

### Part 3: Signs of Financial Fraud Found in the Trust A and B Records

### *Accounting Information Received*

Despite their efforts to avoid discovery, defendants produced approximately 16,000 pages of financial records, including brokerage statements, bank statements, tax returns, estate and probate filings, trust fiduciary accountings, and credit card transactions. These pertained

primarily to the MTZ Trust, A Trust, and B Trust, and some records from my mother's personal trust.

We submitted these records to expert accountant Jeff Donohoe, who has extensive experience in forensic accounting and fiduciary matters; his review raised serious concerns about potential fraud and the integrity of the financial documentation.

### *Accounting is incomplete*

According to Donohoe's 6/17/2020 report on defendants October 2019 production: "the information provided by the Defendants in the Bates numbered production is itself incomplete. There are many documents that are missing whole sections, and in other cases, documents one would expect to see in connection with other records produced are simply absent." (Exhibit N) In his 8/2/2021 report a year later, after reviewing the additional productions, he wrote: "I renew my original statement that the information provided to date by the Defendants including the additional information provided is incomplete." (Exhibit O) He went on to explain that the additional records produced did not answer any of the questions he had written about in his initial report, and it contained the same insufficiencies as the original production in the form of large gaps in page numbers, and new related account numbers for which no information had been provided.

### *Records review raises serious concerns*

Donohoe raised serious concerns over the information provided, particularly the dizzying asset transfers between and among various brokerage accounts. Donohoe observed in his 6/17/2020 report that this pattern was highly unusual and raised serious concern as there was no apparent tax or investment benefit. He wrote, "this complexity can be created by design, making the tracking of assets extremely difficult ... such transfers can be used… for concealment." Donohoe further noted that "this provides an unscrupulous fiduciary or account manager an opportunity to siphon off assets with less risk of detection."

In his 8/2/2021 report, Donohoe confirmed the same pattern in the documents provided, citing "a continued display of dizzying asset transfers." Additionally, Donohoe highlighted several specific red flags:

- **Frequent and Complex Transfers**: Assets were frequently transferred between multiple brokerage accounts, often involving in-kind transfers rather than cash. This included accounts at Morgan Stanley and Merrill Lynch, as well as Vanguard IRA accounts.
- **Opaque Transactions**: The transfers often involved only partial balances and were spread across several accounts, making the tracing of assets extremely difficult. This pattern was noted across multiple accounts and trusts, including the MTZ Trust, A Trust, and B Trust.
- **Unexplained Use of Multiple EINs**: Discrepancies were found in the use of Employer Identification Numbers (EINs) for the estate and other accounts, which were sequential but different from the EIN of the estate itself. This raised further suspicion about the potential for fraudulent activity.

Donohoe's findings raise serious concerns about potential fraud and money laundering due to the complex and opaque nature of the transactions, the lack of clear tax or investment benefits, and the possibility of asset misappropriation. This, combined with the fact that records were incomplete, adds to the level of concern, which is why I need to hold McDonald Hopkins accountable and get answers about the whereabouts of my Irrevocable Trust.

### Resolution of probate case

For four long years, the defendants employed a relentless obstructionist strategy to resist every request that I made. This strategy was designed to tire out everyone involved, including the court. The defense's discovery delay tactics included making multiple requests to put discovery on hold, encouraging the establishment of discovery deadlines, sending letters to block third-party discovery, filing motions to quash, and repeatedly accusing me of engaging in a fishing expedition. They also invoked financial privacy concerns and attorney-client privilege to withhold information. Together, the defense made a total of 15 requests for extension, moving to

extend a deadline for a single brief 8 times, and filing 9 motions to dismiss or for summary judgment.

After years of back and forth, in August 2021, my attorney filed a 25-page motion to compel, aimed at obtaining the underlying financial records to determine if my father's assets were properly accounted for and allocated to the trusts as per his wishes. The defense's motion in opposition claimed I should only have rights to the trusts mentioned in my complaint and only for the period following my father's death. The court, understandably tired of the relentless stonewalling strategy, issued an October 22, 2021 order that limited the records to which I should have access (Exhibit P). This order restricted discovery to only the Sarah, Irrevocable, MTZ, A, and B trusts, stating that nothing else was "relevant" to my claims. Additionally, the order limited my access to the period during which my mother served as Trustee for the MTZ, A, and B trusts, despite the accounting claim having no time limitation.

Furthermore, our request for the TIN numbers of the Irrevocable Trusts was denied, rendering my third-party discovery fruitless. With these limitations, it is impossible to know whether my father's estate has been properly administered, or what became of my money. The accounting principle of "follow the dollar" is crucial here; without a complete financial picture, we cannot determine if assets have been misappropriated. As Justice Louis Brandeis famously said, "Sunlight is said to be the best of disinfectants." I believe the court's order was unfair and detrimental to my legal rights, both to discovery and to protect my family's interests. Ultimately, the court succumbed to the defense's tactics and scheduled a trial without a jury and a final pretrial that I flew home to attend.

### Settlement with my Mother

During the final pretrial, I signed a settlement agreement with my mother, which is attached here as (Exhibit Q). While the settlement primarily protects McDonald Hopkins, my hope was that this agreement would help restore the strained relationship with my mother caused by the litigation. Despite my reservations about the settlement terms, I felt immense pressure from both the judge and my own lawyer to sign the agreement. My lawyer even threatened to

report me to child services, questioning my commitment to my son's best interest if I did not comply. This threat was witnessed by both his wife and my husband. I didn't sign the longer version of the settlement sent by my mother's lawyer because of these same concerns, but then the court ordered that the short form document was final.

### *Claims dropped against McDonald Hopkins*

Due to financial constraints and my inability to travel internationally for trial, I was forced to drop claims against McDonald Hopkins without prejudice. Unfortunately the litigation brought me to bankruptcy, making it impossible to continue paying my lawyer, who subsequently withdrew from my case before trial. I considered representing myself pro se, but after my request to postpone or hold the trial virtually was denied, I had no option but to drop the charges against McDonald Hopkins with plans to refile within the one-year deadline under the Ohio savings statute.

## IV.    SUMMARY

Thank you for your assistance with my case. This case involves the mishandling of family trusts by McDonald Hopkins, resulting in a multi-million-dollar trust being unaccounted for, the disinheritance of my son and me, and significant family discord. The defendants employed deliberate tactics to delay and complicate discovery, depriving me of my legal rights. The limited information received raised more questions, suggesting concealment of the truth and indications of potential theft and misappropriation of trust assets. Judicial intervention is critically needed to uncover the truth and hold the wrongdoers accountable.

I have experienced significant disappointment and frustration with the legal process leading up to and throughout my probate case. I have faced numerous obstacles, including financial obstacles and potential biases related to my age, gender, and my father's nationality and religion. The influence of McDonald Hopkins in the Ohio community has further complicated my efforts, making it difficult to secure counsel and navigate the legal system effectively. My

experiences have been disheartening and have led me to question where beneficiaries can turn when faced with such obstacles.

I am grateful to the Northern District of Ohio court and the opportunity provided by the Ohio savings statute. If there is any valid reason why my father's wishes have not been fully honored, it should be straightforward to demonstrate. I respectfully ask for your assistance in uncovering the truth to honor my father's intentions and protect his family's future.

## V.     STATEMENT OF CLAIMS

1. **Breach of Fiduciary Duty**

   McDonald Hopkins LLC has breached its fiduciary duties owed to me as a beneficiary of the Irrevocable and MTZ Trusts by failing to provide the required financial records and accountings. Specific breaches include:
   - Failing to provide comprehensive financial records despite multiple requests over seven years.
   - Obstructing discovery efforts by refusing to produce documents and respond to subpoenas.
   - Mismanaging and possibly misappropriating trust assets, as evidenced by conflicting statements and incomplete financial records.
   - Failing to provide any accountings for the Irrevocable Trust.
   - Failing to provide accountings for Trusts A and B for the years 2021 and 2022.

2. **Fraud and Misrepresentation**

   McDonald Hopkins LLC has engaged in fraudulent conduct by providing misleading and conflicting information about the status and administration of the trusts. Specific instances of fraud include:
   - Providing false information about the termination and funding of the Irrevocable Trust.

- Misrepresenting the financial status and transactions within the trusts to conceal potential misappropriation.

3. **Negligence**

McDonald Hopkins, as legal advisors and fiduciaries with delegated duties, have been grossly negligent in their duties by failing to maintain accurate records, provide necessary information, and properly manage the trust assets. This negligence has resulted in significant financial harm and emotional distress to the beneficiaries, including:

- Failing to ensure proper documentation and transparency in trust administration.
- Ignoring legal obligations to provide financial information and records.
- Allowing or facilitating improper transfers and transactions within the trusts.

4. **Obstruction of Justice**

McDonald Hopkins LLC has deliberately obstructed justice by employing a strategy of relentless obstruction and delay throughout the litigation process. This includes:

- Refusing to comply with discovery requests and subpoenas.
- Filing frivolous motions and objections to delay proceedings and avoid accountability.
- Engaging in tactics designed to exhaust my resources and resolve the case without addressing the substantive issues.

5. **Breach of Contract**

McDonald Hopkins LLC has breached the terms of the trust agreements, which explicitly state that beneficiaries have the right to inspect the records of the trust at reasonable times. By denying access to these records, McDonald Hopkins LLC has violated the contractual obligations set forth in the MTZ Trust and Irrevocable Trust documents.

6. **Conversion**

McDonald Hopkins LLC has wrongfully converted trust assets for its own use or purposes not intended by the trust, depriving me and other beneficiaries of our rightful inheritance and financial security. This includes:

- Unauthorized transfers of trust assets.
- Failing to account for significant sums of money that should have been distributed according to the trust terms.

## VI. PRAYER FOR RELIEF

Given McDonald Hopkins LLC's egregious conduct and the harm caused, I seek the following relief from the court:

1. **Monetary Damages**

Compensation for the financial losses incurred due to McDonald Hopkins LLC's breach of fiduciary duty, including the loss of the Irrevocable Trust, which would be valued between $6-8 million today.

Compensation for the $400,000 expected share of the Roth IRA that I did not receive due to the alleged mistake. The value today would be an estimated 700-850 thousand dollars.

Reimbursement for the costs of the first lawsuit in its entirety, including all consultations leading up to the litigation, plus compensation for the time and emotional drain spent fighting this case, which impacted my career and family life.

Punitive damages to address McDonald Hopkins LLC's bad faith and reckless indifference in handling the trust matters.

2. **Irrevocable Trust Records**

An order compelling McDonald Hopkins to provide a full and complete unredacted accounting of all Irrevocable Trust accounts and transactions from 1997 to the present. We know that retention policies are not an issue since Morgan Stanley provided a 2004 record from Smith Barney in the first filing.

Court-issued subpoenas for third-party financial institutions to produce relevant records, bypassing the need for the trustee's involvement due to the settlement terms, and a court order granting me access to the records without the trustee's approval, in respect of the settlement agreement terms.

Note: the subpoenas must be broad enough to account for inconsistent naming in financial records, ensuring complete access to all account statements from Morgan Stanley (and its predecessors, such as Smith Barney) related to any and all of my father's investments. This is crucial because, without TIN numbers and account numbers, Morgan Stanley have stated that they cannot differentiate which accounts belonged to the Irrevocable trusts.

3. **Roth IRA Records**

   An order compelling the production of all records and communications related to the Roth IRA from Vanguard and McDonald Hopkins, including any documents explaining the supposed "mistake" and all communications with your father regarding the beneficiary designations.

4. **Engagement Letters**

   An order requiring the production of all engagement letters between McDonald Hopkins and my father, as well as my mother. This is crucial to prevent McDonald Hopkins from making claims that these agreements are protected by attorney-client privilege, in an effort hinder my ability to prove that duties were delegated.

5. **Other Relief**

Award of the costs of this litigation, including attorney's fees and other expenses incurred in seeking justice.

Any other relief the court deems just and equitable to remedy the harm caused by McDonald Hopkins LLC's actions.

## VII.  JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, Sarah Elizabeth Alkuda, hereby demands a trial by jury on all issues so triable.

## VIII.  CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Respectfully submitted,


Sarah E. Alkuda



Plaintiff, Pro Se

Mailing Address:
945 McKinney St. Unit 17873
Houston, TX, 77002

Residential Address:
Al Khan, Sharjah, U.A.E.

+971 56 817 7335
Sarah.alkuda@gmail.com